No. 25-60073

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

ROBERT HARRIS; DARIUS HARRIS; MALCOLM STEWART,

*Plaintiffs-Appellants*,

v.

SAM DOBBINS, in his individual capacity; CHARLES HENDERSON, in his individual and official capacities as Interim Chief of Police of Lexington, Mississippi; CITY OF LEXINGTON; LEXINGTON POLICE DEPARTMENT; JAMES SHIERS, in his individual capacity,

*Defendants-Appellees*.

On Appeal from the United States District Court for the Southern District of Mississippi, No. 3:22-cv-00479-TSL-MTP; Hon. Tom S. Lee

## BRIEF OF APPELLANTS

JILLIAN HEWITT
JASON BELL
SUSMAN GODFREY L.L.P.
One Manhattan West
New York, NY 10001
(212) 336-8330
jhewitt@susmangodfrey.com
jbell@susmangodfrey.com

JILL COLLEN JEFFERSON
JULIAN
440 N. Barranca Avenue, Suite 3717
Covina, CA 91723
(601) 202-1173
jillcollen@julianfreedom.org

LAUREN BONDS
KEISHA JAMES
ELIANA MACHEFSKY
NATIONAL POLICE
ACCOUNTABILITY PROJECT
1403 Southwest Boulevard
Kansas City, Kansas 66103
(504) 220-0401
legal.npap@nlg.org
keisha.npap@nlg.org
eliana.npap@nlg.org

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

No. 25-60073

ROBERT HARRIS; DARIUS HARRIS; MALCOLM STEWART,

*Plaintiffs-Appellants*,

v.

SAM DOBBINS, in his individual capacity; CHARLES HENDERSON, in his individual and official capacities as Interim Chief of Police of Lexington, Mississippi; CITY OF LEXINGTON; LEXINGTON POLICE DEPARTMENT; JAMES SHIERS, in his individual capacity,

*Defendants-Appellees*.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**<u>Parties</u>**

1. Robert Harris, Plaintiff-Appellant
2. Darious Harris, Plaintiff-Appellant
3. Malcolm Stewart, Plaintiff-Appellant
4. Sam Dobbins, Defendant-Appellee
5. City of Lexington, Defendant-Appellee
6. Lexington Police Department, Defendant-Appellee
7. Charles Henderson, Defendant-Appellee
8. Cordarius Epps, Defendant-Appellee
9. Derrick Scott, Defendant-Appellee

**<u>Counsel for Plaintiffs-Appellants</u>**:

1. Jason Bell; Susman Godfrey L.L.P.

2. Jillian Hewitt; Susman Godfrey L.L.P.

3. Jill Collen Jefferson; JULIAN

4. Lauren Bonds; National Police Accountability Project

5. Keisha James; National Police Accountability Project

6. Eliana Machefsky; National Police Accountability Project

**<u>Additional Parties in Underlying Case</u>**:

1. Eric Redmond, Plaintiff

2. Justin Newell, Defendant

3. James Shiers, Defendant

**<u>Additional Counsel for Plaintiffs in Underlying Case</u>**:

1. Thomas Bellinder; Bellinder Law Firm

2. Xiwei Wu; Bellinder Law Firm

3. Adabelle U. Ekechukwu; Wachtell, Lipton Rosen & Katz

4. Jonathan M. Moses; Wachtell, Lipton Rosen & Katz

5. Ioannis Dimitrios Drivas; Wachtell, Lipton Rosen & Katz

**<u>Counsel for Defendant-Appellee Dobbins</u>**:

1. Bethany A. Tarpley; Jacks Griffith Luciano, P.A.

2. Daniel J. Griffith; Jacks Griffith Luciano, P.A.

**Counsel for Defendants-Appellees City of Lexington, Lexington Police Department Henderson, Epps, and Scott**:

1. Gregory Todd Butler; Phelps Dunbar, L.L.P.
2. Mallory Kaye Bland; Phelps Dunbar, L.L.P.


**Additional Counsel for Defendant Dobbins in Underlying Case**:

1. Katherine Portner McClellan; Jacks Griffith Luciano, PA
2. Mary McKay Griffith; Jacks Griffith Luciano, PA


**Additional Counsel for Defendants City of Lexington, Lexington Police Department Henderson, Epps, Scott, and Newell in Underlying Case**:

1. William T. Siler, Jr.; Phelps Dunbar, L.L.P.


**Additional Counsel for Defendant Shiers in Underlying Case**:

1. Marcellus D. Chamberlain; Phelps Dunbar, L.L.P.
2. Garrett Alan Anderson; Phelps Dunbar, L.L.P.


**Judges**:

1. The Honorable Tom S. Lee, United States District Judge
2. The Honorable Michael T. Parker, United States Magistrate Judge


**Related Cases**:

1. *Reeves v. Dobbins, et al.*, No. 3:23-cv-333-TSL-MTP (S.D. Miss.), Appeal filed before the Fifth Circuit: Dec. 23, 2024 (No. 24-60557).
2. *Jew v. Dobbins, et al.*, No. 3:23-cv-2983-CWR-LGI (S.D. Miss.), Appeal filed before the Fifth Circuit: Nov. 27, 2024 (No. 24-60610).

3. *Secherest, et al. v. City of Lexington, et al.*, No. 3:24-cv-34-TSL-MTP (S.D. Miss.)

4. *Young v. Dobbins, et al.*, No. 3:24-cv-752-HTW-LGI (S.D. Miss.)

5. *Powell v. Henderson, et al.*, No. 3:24-cv-815-CWR-ASH (S.D. Miss.)

## **Additional Interested Persons and Entities in Related Cases**:

*Reeves v. Dobbins, et al.*:

1. Peter Reeves, Plaintiff-Appellant
2. Zal K. Shroff; Counsel for Appellant; CUNY School of Law

*Secherest, et al. v. City of Lexington, et al.*:

1. Leroy Secherest, Plaintiff
2. Damion Levy, Plaintiff
3. Tyqwon Walden, Plaintiff
4. Marcus Young, Plaintiff
5. Aricka Stewart, Plaintiff
6. Comechia Randle, Plaintiff
7. Quarneeshia Walden, Plaintiff
8. Dornell Malone, Plaintiff
9. John Adams, Plaintiff
10. Dwayne Stewart, Plaintiff
11. Yolanda Wallace, Plaintiff
12. Crystal Wallace, Plaintiff
13. Leon Lewis, Plaintiff
14. Curtis Johnson, Plaintiff
15. Frederick Johnson, Plaintiff

16. Leontay Ellington, Plaintiff

17. James Bankhead, Jr., Plaintiff

18. Minnie Stewart, Plaintiff

19. Robin McCrory, Defendant

20. Aaron Agee, Defendant

21. Chris Burrell, Defendant

22. Laron Simpson, Defendant

23. Scott Walters, Defendant

24. Robin McRory, Defendant

25. Wilton Byars, III; Counsel for Defendant; Daniel, Coker, Horton & Bell, PA

26. Julia Bryant Jimenez; Counsel for Defendant; Daniel, Coker, Horton & Bell, PA

27. Shea Stewart Scott; Counsel for Defendant; Daniel, Coker, Horton & Bell, PA

28. Miranda Breanne Mammen; Counsel for Plaintiff; Bellinder Law Firm

29. Jonathan Matthew Eichelberger; Counsel for Plaintiff; Eichelberger Law

*Jew v. Dobbins, et al.*:

1. Alexis Jew, Plaintiff-Appellee

2. Martha F. Hutton; Counsel for Plaintiff-Appellee; O'Melveny & Myers, L.L.P.

3. Sarah E. Higgins; Counsel for Plaintiff-Appellee; O'Melveny & Myers, L.L.P.

4. Javed Yunus; Counsel for Plaintiff-Appellee; O'Melveny & Myers, L.L.P.

5. Joshua Tom; Counsel for Plaintiff-Appellee; American Civil Liberties Union of Mississippi

6. The Honorable Carlton W. Reeves, United States District Judge

7. The Honorable LaKeysha Greer Isaac, United States Magistrate Judge

*Young v. Dobbins, et al.*:

1. Andrial Young, Plaintiff

2. Carrie A. Gonnell; Counsel for Plaintiff; Morgan, Lewis & Bockius, LLP

3. Mayra Negrete; Counsel for Plaintiff; Morgan, Lewis & Bockius, LLP

4. The Honorable Henry T. Wingate, United States District Judge

*Powell v. Henderson, et al.*:

1. Deborah Powell, Plaintiff

2. The Honorable Andrew S. Harris, United States Magistrate Judge

Dated:  May 28, 2025                    */s/ Jason Bell*
                                           Jason Bell
                                           *Counsel of Record*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fifth Circuit Rule 28.2.3, Plaintiffs-Appellants respectfully request oral argument to answer any questions regarding the factual record, procedural history, and legal questions at issue on appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ........................................... viii

TABLE OF CONTENTS.........................................................................................ix

TABLE OF AUTHORITIES ..................................................................................xi

INTRODUCTION .................................................................................................1

JURISDICTIONAL STATEMENT .......................................................................4

STATEMENT OF ISSUES ....................................................................................5

STATEMENT OF THE CASE...............................................................................6

I.     Factual Background ...................................................................................6

       A.     Lexington's Unconstitutional Roadblocks............................................7

       B.     Lexington Retaliates Against Malcolm Stewart .................................10

       C.     Lexington Retaliates Against Robert Harris and Darious Harris........13

II.    Procedural History ...................................................................................17

SUMMARY OF ARGUMENT ............................................................................20

STANDARDS OF REVIEW ................................................................................22

ARGUMENT .......................................................................................................23

I.     The District Court Erred by Dismissing for Lack of Standing the
       Roadblock Claims....................................................................................23

       A.     The District Court Erred in Holding that a Prior Roadblock
              Stop Was Necessary to Bring a Roadblock Claim.............................24

       B.     Malcolm Stewart Has Standing to Bring Roadblock Claims.............27

       C.     Darious Harris Has Standing to Bring Roadblock Claims.................31

       D.     Robert Harris Has Standing to Bring Roadblock Claims. .................33

II.     The District Court Erred by Dismissing Malcolm Stewart's False
        Arrest Claims Against Epps and the City........................................33

        A.      Stewart's False Arrest Claim Against Epps Should Proceed.............33

        B.      Stewart's False Arrest Claim Against the City Should Proceed.........37

III.    The District Court Erred by Dismissing the Plaintiffs' First
        Amendment Retaliation Claims........................................................39

        A.      The District Court Erred by Dismissing the Harrises'
                Retaliation Claims Against Dobbins, Epps, and Henderson..............39

        B.      The District Court Erred by Dismissing Malcolm Stewart's
                Retaliation Claims Against Dobbins, Epps, and Scott.......................46

                1.      Stewart Adequately Alleged His Retaliatory Arrest
                        Claim Against Epps. ...................................................46

                2.      Stewart Adequately Alleged Retaliation Claims
                        Against Scott. ...........................................................48

        C.      The District Court Erred by Dismissing the First Amendment
                Retaliation Claims Against the City....................................................50

                1.      Lexington is Liable for the Retaliation Against
                        Stewart and the Harrises. ...........................................50

                2.      Lexington is Also Liable for the Retaliatory Arrests of
                        Stewart and the Harrises. ...........................................53

CONCLUSION..........................................................................................55

CERTIFICATE OF SERVICE ...............................................................57

CERTIFICATE OF COMPLIANCE.......................................................58

# TABLE OF AUTHORITIES

**Cases**

*Alderson v. Concordia Parish Corr. Facility*
   848 F.3d 415 (5th Cir. 2017) ........................................................44

*Already, LLC v. Nike, Inc.*
   568 U.S. 85 (2013)..........................................................................32

*Aransas Project v. Shaw*
   775 F.3d 641 (5th Cir. 2014) ........................................................25

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*
   627 F.3d 547 (5th Cir. 2010) ........................................................22

*Babbitt v. United Farm Workers Nat'l Union*
   442 U.S. 289 (1979)........................................................................26

*Bailey v. Ramos*
   125 F. 4th 667 (5th Cir. 2025) ......................................................41

*Bennett v. City of Slidell*
   728 F.2d 762 (5th Cir. 1984) ........................................................52

*Blum v. Yaretsky*
   457 U.S. 991 (1982)........................................................................26

*Bond v. Nueces Cnty.*
   2022 WL 4595000 (5th Cir. Sept. 30, 2022)........................ 39, 52

*Brown v. Jones Cnty. Junior Coll.*
   463 F. Supp. 3d 742 (S.D. Miss. 2020) ........................................43

*Carroll v. Abide*
   788 F.3d 502 (5th Cir. 2015) ........................................................22

*City of Houston v. Hill*
   482 U.S. 451 (1987)................................................................ 40, 45

*City of Los Angeles v. Lyons*
   461 U.S. 95 (1983)..........................................................................28

*Clark Cnty. Sch. Dist. v. Breeden*
    532 U.S. 268 (2001)..................................................................44

*Club Retro, L.LC. v. Hilton*
    568 F.3d 181 (5th Cir. 2009) .........................................37

*Crawford v. Hinds Cnty. Bd. of Supervisors*
    1 F. 4th 371 (5th Cir. 2021) ...................................... 25, 26

*Davidson v. City of Stafford*
    848 F.3d 384 (5th Cir. 2017) ........................... 38, 39, 52

*Deutsch v. Annis Enters., Inc.*
    882 F.3d 169 (5th Cir. 2018) .........................................22

*Deville v. Marcantel*
    567 F.3d 156 (5th Cir. 2009) .........................................35

*Drewniak v. U.S. Customs & Border Prot.*
    554 F. Supp. 3d 348 (D.N.H. 2021) ............................28

*Frame v. City of Arlington*
    657 F.3d 215 (5th Cir. 2011) .........................................30

*Gonzalez v. Trevino*
    602 U.S. 653 (2024)..................................................................47

*Hall v. Trochessett*
    105 F. 4th 335 (5th Cir. 2024) .....................................34

*Heck v. Humphrey*
    512 U.S. 477 (1994)..................................................................19

*Hicks v. Dowies*
    2022 WL 827804 (W.D. La. Mar. 18, 2022)..................................42

*Hope v. Pelzer*
    536 U.S. 730 (2002)..................................................................45

*In re Katrina Canal Breaches Litig.*
    495 F.3d 191 (5th Cir. 2007) .........................................23

*Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*
    946 F.3d 649 (5th Cir. 2019) ............................ 24, 30, 33

*Inclusive La. v. St. James Parish*
  134 F. 4th 297 (5th Cir. 2025)............................................ 27, 29, 31

*Irizarry v. Yehia*
  38 F. 4th 1282 (10th Cir. 2022) ..................................................42

*K.P. v. LeBlanc*
  627 F.3d 115 (5th Cir. 2010) ........................................... 24, 30, 33

*Keenan v. Tejeda*
  290 F.3d 252 (5th Cir. 2002) ............................................... passim

*Lozman v. Riviera Beach*
  585 U.S. 87 (2018)....................................................... 53, 54

*Mayfield v. Butler Snow, L.L.P.*
  75 F. 4th 494 (5th Cir. 2023) ............................................. 53, 55

*MedImmune, Inc. v. Genentech, Inc.*
  549 U.S. 118 (2007).........................................................26

*Moore v. Bryant*
  853 F.3d 245 (5th Cir. 2017) ...............................................22

*N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*
  781 F.3d 182 (5th Cir. 2015) ...............................................22

*NAACP v. Alabama ex rel. Patterson*
  357 U.S. 449 (1958)........................................................47

*Nieves v. Bartlett*
  587 U.S. 391 (2019)..................................................... 47, 48

*Petersen v. Johnson*
  57 F. 4th 225 (5th Cir. 2023) ..............................................36

*Peterson v. City of Ft. Worth*
  588 F.3d 838 (5th Cir. 2009) ........................................... 39, 50

*Pineda v. City of Houston*
  291 F.3d 325 (5th Cir. 2002) ..............................................52

*Porter v. Epps*
  659 F.3d 440 (5th Cir. 2011) ..............................................44

*Porter v. Houma Terrebone Housing Auth. Bd. of Comm'rs*
   810 F.3d 940 (5th Cir. 2015) ...........................................................49

*Reeves v. Dobbins*
   No. 23-CV-333, Dkt. 298, (S.D. Miss. Sept. 24, 2024) ...............................19

*Reitz v. Woods*
   85 F. 4th 780 (5th Cir. 2023) ...........................................................36

*Rincon v. City of Laredo*
   2025 WL 603883 (5th Cir. Feb. 25, 2025) ...................................................44

*Robinson v. Midland Cnty.*
   80 F. 4th 704 (5th Cir. 2023) ................................................... 22, 23

*Rodriguez v. Rutter*
   310 F. App'x 623 (5th Cir. 2009) ...........................................................36

*Rollins v. Home Depot USA*
   8 F. 4th 393 (5th Cir. 2021) ................................................... 36, 45

*Sam v. Richard*
   887 F.3d 710 (5th Cir. 2018) ...........................................................35

*Susan B. Anthony List v. Driehaus*
   573 U.S. 149 (2014)...........................................................24

*Taylor v. Riojas*
   592 U.S. 7 (2020)...........................................................45

*Teamsters v. United States*
   431 U.S. 324 (1977)...........................................................30

*Umphress v. Hall*
   133 F. 4th 455 (5th Cir. 2025) ................................................... 22, 33

*United States v. Grant*
   349 F.3d 192 (5th Cir. 2003) ...........................................................31

*United States v. Leon*
   468 U.S. 897 (1984)...........................................................34

*United States v. Smith*
   110 F. 4th 817 (5th Cir. 2024) ...........................................................49

*Valle v. City of Houston*
    613 F.3d 536 (5th Cir. 2010) ..........................................................38

*Villareal v. City of Laredo*, 134 F. 4th 273 (5th Cir. 2025)....................................54

**Statutes**

28 U.S.C. § 1291 ...........................................................................................5

28 U.S.C. § 1331 ...........................................................................................4

**Rules**

Fed. R. App. P. 4(a)(1)(A) ...........................................................................5

# INTRODUCTION

Two main roads lead into Lexington, a tiny town in the Black Belt of Mississippi. Starting in 2021, Lexington's Chief of Police, a White man named Sam Dobbins, set up hundreds of checkpoints on these highways to collect fines from Black drivers. He did so whenever events were held in the Black community, from high school sports games to graduations. But the Lexington police did not use checkpoints when events were held at the predominately White high school. And White drivers were allowed to pass through the roadblocks even while Black drivers were stopped, ticketed, and arrested.

Those Black citizens who criticized the Lexington police or spoke out about the discriminatory roadblocks were threatened, tased, and arrested by Dobbins, his right-hand man Charles Henderson, and other officers in the Lexington Police Department. For example, after Robert Harris challenged the authority of the LPD to harass him, Dobbins threatened Harris that if they kept "bumping heads" there would be a "killing." Dobbins said that Robert Harris's brother, Darious Harris, had been tased for "talking." And a day or two after they attended a community meeting about LPD misconduct, the Harrises and another Black resident of Lexington, Malcolm Stewart, were arrested.

Dobbins was eventually fired after he was caught on tape bragging that he shot a "n***** 119 times," had "killed 13 men in [his] career," and planned to arrest

Robert Harris for "talkin' in the street." But the roadblocks and retaliation have continued under Henderson, whom the Board appointed to replace Dobbins.

In August 2022, the Harrises, Malcolm Stewart, and two additional plaintiffs brought this civil rights suit to challenge the pervasive pattern of unconstitutional policing in Lexington. They alleged that the roadblocks violated their rights under the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment. They claimed that they had been arrested without probable cause. And they asserted that the LPD had retaliated against them for exercising their First Amendment rights.

The district court held a hearing, denied a preliminary injunction, and ultimately granted the defendants' motions for judgment on the pleadings or, in the alternative, summary judgment. That decision was incorrect and should be reversed.

*First*, the district court held that the Harrises and Stewart lack standing to bring claims for damages or injunctive relief based on the roadblocks because they had never been stopped at one. That decision misconstrued the law and the record. Contrary to the district court's opinion, standing to seek an injunction may be based on a substantial risk of injury. And a person who has personally been subjected to unequal treatment has suffered a concrete injury under Article III. The Harrises and Stewart reside in or visit Lexington and face a substantial risk of encountering, being seized at, or being subjected to unequal treatment at one of hundreds of roadblocks

2

the LPD regularly deploys to target the Black community. Moreover, because Darious Harris and Stewart have already personally encountered and now take active steps to avoid these discriminatory checkpoints, they have already been unequally treated. But even if the district court were somehow right that a past roadblock stop is a prerequisite to seeking injunctive relief, Darious Harris *was* previously seized at a roadblock.

*Second*, the district court held that Stewart failed to state a false arrest claim against Officer Cordarius Epps, and that the amended complaint did not include sufficient allegations to plead an official custom of false arrests in Lexington. Epps arrested Stewart on April 9, 2022—two days after Stewart criticized the LPD at the community meeting—purportedly on a warrant for unpaid fines. But Stewart alleged that Epps never showed him the warrant and the judge denied signing it. Stewart further alleged that he had arranged to pay off those fines with the former Chief of the LPD, that he paid off the fines by servicing LPD vehicles, and that he received notice from the municipal clerk that the fines had been paid. Given these facts, the district court erred in deciding that any arguable probable cause existed to arrest Stewart. Plaintiffs also identified five other similar false arrests that, in the small town of Lexington, are sufficient to state a claim for municipal liability.

*Third*, in focusing almost exclusively on the plaintiffs' retaliatory arrest claims, the district court failed to properly analyze retaliation claims based on

intimidation tactics other than seizures. The Harrises alleged they were retaliated against with death threats and violence. Stewart alleged that he was tailed and threatened by the LPD after the community meeting. These intimidation tactics would chill anyone from speaking out against the police, and no reasonable officer could think that retaliating against a critic of the police with threats or violence could be constitutional. And of course, if this Court allows Stewart's false arrest claim against Epps to proceed, the dismissal of his retaliatory arrest claim should be reversed as well.

*Finally*, the district court erred in dismissing the First Amendment retaliation claims against Lexington without even considering whether the amended complaint pleads a policy or custom of retaliation. Plaintiffs identified at least 18 similar instances of retaliatory threats, violence, harassment, and seizures. And Dobbins detailed LPD's policy of retaliating against citizens who challenged the police in his recorded and reported comments. In light of this policy of retaliation, Lexington is also liable for the retaliatory arrests of the Harrises and Stewart, regardless of whether probable cause existed for those seizures.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. On February 14, 2025, Malcolm Stewart, Robert Harris, and Darious Harris timely appealed the final

judgment of January 17, 2025. ROA.3378-79; ROA.3385-87; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Did the district court err in holding that Stewart and the Harrises lacked standing to bring claims challenging Lexington's racially discriminatory roadblocks even though the roadblocks had already injured them and even though they faced a substantial risk of future injury?

2.      Did the district court err in dismissing Stewart's claim that Epps arrested him without a warrant or probable cause on April 9, 2022 for outstanding fines that he had already paid?

3.      Did the district court err in dismissing Stewart's false arrest claim against Lexington given five similar incidents of unlawful arrests identified by plaintiffs?

4.      Did the district court err in dismissing Stewart's First Amendment retaliation claims against Dobbins, Epps, and Scott?

5.      Did the district court err in dismissing the Harrises' First Amendment retaliation claims against Dobbins, Epps, and Henderson?

6.      Did the district court err in dismissing Stewart's and the Harrises' First Amendment retaliation claims against Lexington?

## STATEMENT OF THE CASE

### I.    Factual Background

Lexington, Mississippi is less than two-and-a-half miles from end to end. *See* ROA.465. Fewer than 1,800 people live in town, and around 1,500 of them are Black. ROA.451. In 2021, a White man named Sam Dobbins became the Chief of Police and set out to raise revenue by collecting fines from Lexington's Black community. *See* ROA.263, 452-53, 476. Since then, over 200 Black citizens have complained about mistreatment by the Lexington Police Department ("LPD"). ROA.458.

In April 2022, Dobbins was caught on tape bragging about how he terrorized Lexington. *See* ROA.264, 475. On the recording, Dobbins boasted that he had "killed 13 men in [his] career" and shot a "n***** 119 times." ROA.3524 (Ex. C 6:18-6:28, 6:56-6:58).  He told a subordinate that he wouldn't care if an officer "killed a motherf***** in cold blood." ROA.3524 (Ex. C 6:01-6:06). He said that he planned to arrest Robert Harris, a Black resident of Lexington, for "talkin' in the street." ROA.3524 (Ex. C 7:55-8:21). And he relished the fact that the Black community feared him. *See* ROA.3524 (Ex. C 14:17-37).

After the recording was released in July 2022, the Board of Aldermen voted 3-2 to terminate Dobbins. ROA.475-76. But instead of starting fresh, the City hired Charles Henderson, one of Dobbins's collaborators, as Interim Chief. ROA.476.

A month later, Appellants Robert Harris, Darious Harris, and Malcolm Stewart, as well as Eric Redmond and Peter Reeves, filed this federal civil rights action.[1] *See* ROA.38. The district court held a hearing and denied a preliminary injunction. ROA.377-404. Plaintiffs filed an amended complaint. ROA.451.

As alleged in the amended complaint and reflected in the record below, Dobbins, Henderson, their subordinates, the LPD, and the City have repeatedly violated the rights of Black citizens in Lexington. They have erected and continue to use without any legitimate purpose hundreds of roadblocks that target the Black community. They have arrested Black citizens without probable cause. And they routinely retaliate against those who speak up about these abuses of power.

## A.    Lexington's Unconstitutional Roadblocks

The amended complaint alleges that the LPD uses discriminatory roadblocks targeted at the Black community to unlawfully seize Black motorists. ROA.465, 482-84. During Dobbins's tenure, Lexington conducted roadblocks multiple times a day for several months. ROA.465. At least 300 checkpoints were set up between 2021 and 2022. ROA.465. Chief Henderson has continued that policy. *See, e.g.*, ROA.453, 479 (alleging that Henderson erected a roadblock on July 31, 2022 to stop Black churchgoers).

---

[1] The caption inadvertently refers to Darious Harris as "Darius." This brief uses the corrected spelling of his first name.

Under Lexington's policy, roadblocks are allegedly set up near the predominantly Black Holmes County Central High School whenever it holds events, but not during activities at the predominately White Central Holmes Christian High School. ROA.465. White drivers pass through the roadblocks without being stopped, even as Black drivers have been subjected to dozens of seizures. ROA.465, 483-84; *see also* ROA.472 (alleging that "between June 27, 2021 and May 17, 2022, LPD only arrested seven White individuals but arrested over 100 Black individuals," that "[o]ver 40% of the arrests of the Black individuals were for minor traffic violations," and that "over a quarter of all arrests of all Black individuals were for traffic violations that could not be ascertained prior to the stop").

Peter Reeves is one of many Black residents of Lexington who have been stopped at the roadblocks. ROA.464; *see, e.g.*, ROA.473. Officer Cordarius Epps and then-Officer Henderson arrested him at a checkpoint in March 2022 after Reeves criticized Epps on social media. ROA.464-65. Reeves testified at the hearing that he received another citation at a roadblock because Epps told another officer to "give his a** a ticket." ROA.649:12. One of Reeves's friends in the LPD told him that Epps "did not like what [Reeves] posted" online. ROA.647:12.

The record shows how roadblocks are a constant presence in the lives of Black people in Lexington. One resident was given a doctor's note "to carry . . . in case [she was stopped] in a roadblock . . . [t]elling [officers] what parts of [her] body not

8

to pull." ROA.718:18-24. She testified that Chief Henderson harassed her at a roadblock and that "[i]t ain't no better" since Dobbins was fired. ROA.717:1-723:25, 726:5. Willie March, the County Sheriff, explained that the roadblocks "really started" when Dobbins became Chief and have continued now that Henderson is in charge. ROA.580:17-24; *see also* ROA. 601:5-602:4 (similar testimony from Stewart); ROA.636:12-14 (Reeves's testimony that roadblocks under Henderson occur "two to three times a week, compared to . . . four to five" under Dobbins).

Multiple witnesses confirmed that Lexington uses roadblocks to target the Black community. Reeves noted that the roadblocks were set up on Highway 12, "the route . . . to get" to the predominately Black "Holmes County Central," "when kids are getting ready to go to school," "when school is letting out," or after football and basketball games and graduations. ROA.634:10-22; *see also* ROA.597:15-601:10 (Stewart's testimony that roadblocks are set up "[o]nly when the blacks have a game or any kind of convention," including "a birthday party" or any event with "a crowd of people," and that the police will "[s]ometimes . . . let [people] make it to the game" but afterwards will "set their roadblocks up" along the route back home). Reeves also "heard out of Chief Dobbins' mouth, they have over $1 million in fines, and they plan to collect every last penny." ROA.637:18-20.

Reeves described how the Black community had mobilized to resist Dobbins's efforts. He explained that "Lexington is pretty much a small town" where

"[y]ou can see a roadblock coming." ROA.653:4-5. So "people send out Facebook statuses and text messages" to warn about them. ROA.644:3-4. On the night of Reeves's arrest, he "was the only one that . . . didn't get . . . the alert." ROA.643:21-22. Reeves testified that people sent these warnings because the LPD was "trying to financially cripple the community." ROA.664:3-4.

Malcolm Stewart, another Black resident of Lexington, testified that he changed how he got around town to avoid the roadblocks. On one occasion he drove through a roadblock on "Highway 17" "[r]ight before you get to the Holmes County School." ROA.619:13-19. But when he saw other roadblocks, he would "just pull halfway where they at and turn around." ROA.621:6.

Darious Harris, who lived in the nearby town of Tchula, similarly testified about his roadblock encounters. Although he had "learned how to dodge" the LPD checkpoints, he was once seized for half an hour at a roadblock while driving with his cousin. ROA.693:24, 696:14-18. And he avoided traveling to Lexington if he knew there was a roadblock. ROA.694:4-6.

## B.    Lexington Retaliates Against Malcolm Stewart

The amended complaint alleges that after Malcolm Stewart spoke out about the roadblocks, the LPD retaliated against him. On April 7, Stewart participated in a community meeting where he expressed his concerns about the LPD. ROA.468. He was arrested two days later by Officer Epps. ROA.468. Epps said he was arresting

Stewart on a warrant for outstanding fines. ROA.468. But Stewart, a mechanic, had reached an agreement with the former City Judge and the former Chief of Police that he would work off any outstanding fines by servicing LPD vehicles. ROA.468. He was notified by the municipal clerk in July 2021 that his fines were paid. ROA.468. Stewart alleges that Epps never showed him the warrant and that the judge said he never signed it. ROA.468.

The retaliation continued. On May 28, Officer Derrick Scott followed Stewart out of a gas station and pulled him over for not wearing his seat belt. ROA.469. When Stewart pointed out that Scott could not have seen his seatbelt, Scott said that as an LPD officer he had the authority "to do whatever [he] wanted to." ROA.469. Another time, Scott tailed Stewart and followed him into a gas station. ROA.469. Scott only left Stewart alone after Stewart mentioned his lawyer. ROA.469. And on June 30, 2022, the day after civil rights attorneys met with Lexington's City Attorney, Officer James Shiers arrested Stewart again. ROA.469-70.

Stewart provided a detailed account at the hearing of this retaliation. He testified that he spoke at the April 7 community meeting about how the LPD sets up roadblocks "when the Holmes County School District [has] games and events." ROA.598:18-19. When he was pulled over two days later, on April 9, he was told that he was pulled over because his "tag was out" and that there was a "warrant . . . for the old fine." ROA.589:13-22. But at the time the city clerk told Stewart that he

had worked off the fines, Dobbins was already employed by the LPD. ROA.590:20-591:3. And Stewart testified that the tag was not expired. ROA.608:3-609:11; *cf.* ROA.250-54 (April 9 arrest documents).

Along with his advocacy at the April 7 meeting, Stewart has been an outspoken critic of the LPD. He testified that he filed three or four complaints about LPD officers, spoke with the Mayor and Sheriff March, and filed a complaint through the Justice Court. ROA.594:12-595:8, 596:18-24. He also confronted two aldermen about his arrest on April 9. ROA.595:11-596:6.

But around the time the complaint in this case was filed, and after Dobbins was terminated, the LPD retaliated against Stewart again. In August 2022, Stewart was pulled over for having a headlight out, even though it was 10:00 in the morning and his headlights were off. ROA.591:15-593:13, 617:7-618:24. The officer told him a warrant was out for him, arrested him, held him for at least 45 minutes, and then informed Stewart there was no warrant after all. ROA.592:10-23.

Stewart's arrests were part of Lexington's broader practice of arresting citizens without probable cause. For example, the amended complaint alleges that Eric Redmond, a Black resident of Lexington, was also arrested without probable cause by Dobbins and Shiers. In June 2022, Redmond learned his sister had been arrested and went to the precinct. ROA.466-67. He asked to speak with Dobbins about why her bail was increased. ROA.467. Dobbins told Shiers to arrest Redmond.

12

ROA.467. Shiers took out a taser and said "I'm gonna blast your a**." ROA.467. Redmond was arrested for disorderly conduct. ROA.467. While Redmond was detained, the Department had Redmond's car towed from a private lot where he had parked it without notifying him. ROA.467.

### C.    Lexington Retaliates Against Robert Harris and Darious Harris

Finally, the amended complaint alleges that Lexington also retaliated against the Harrises for speaking out against the LPD.

On New Year's Eve 2021, Robert Harris and Darious Harris were shooting fireworks at Robert Harris's house. ROA.459. Although the LPD allowed other families to shoot fireworks, the police showed up to stop the Harrises. ROA.459. The Harrises alleged the police targeted them because "the officers did not like the stance the brothers took against them." ROA.463. The brothers told the police to leave. ROA.459. Epps then tased Darious Harris. ROA.459. Darious fell to the ground, writhing in agony, while Dobbins stood over him. ROA.459. The officers dragged Darious to the police car. ROA.459-60. The taser barbs were left in his body for over an hour. ROA.463.

Video recordings in the record start part way through this incident. During an argument with the LPD, Robert Harris shouts, "every time you come around I lose my life and my freedom. Stay away from me. I don't f*** with you. . . . Stop f***ing with me." ROA.3524. (Ex. E 0:53-1:02). Less than 10 seconds later, Officer Epps

repeatedly says "move back," Darious Harris says "f*** your mother****ing," and Epps tases him for at least 15 seconds as Darious screams on the ground. The body camera footage is too dark to tell whether Darious obeyed Epps's command.

As alleged in the complaint, Robert Harris then went to the station to ask about Darious. Dobbins told him to "shut up" and "leave," but when Robert tried to do so, Dobbins twisted his arm behind his back and detained him. ROA.462. Dobbins took Robert to his office and said that if they kept "bumping heads," there would be a "killing." ROA.462.

Darious Harris's testimony provides further details. He explained that after his arrest, Dobbins told him "if [he] hadn't been running [his] mouth . . . [he] wouldn't have got tased for talking." ROA.679:13-15. Dobbins instructed the EMTs to remove the taser prongs from Harris, even though they did not have the appropriate tool. ROA.679:18-23. The EMT then "snatched" out the prongs, which felt "like having a tooth pulled . . . without medication." ROA.680:1-12.

Darious Harris also testified that Dobbins told him to call Robert to come pick him up. ROA.680:22-25. But Robert was taken to the back when he arrived, and Darious heard Dobbins say "Robert, y'all need to stop this before somebody get killed. This need to be the end of this. Y'all need to leave this alone." ROA.681:3-10. When they left the station, Dobbins said to them, "I don't want to hear nothing else about this." ROA.682:6-10. And Darious testified another officer "said if it was

him, he wouldn't have pulled his taser out. He would have pulled his gun out." ROA.681:22-23. Three nights later, an LPD car followed him five miles out of town. ROA.683:2-19.

The amended complaint alleges that about three months later, the Harrises attended the April 7 community meeting. ROA.463. They were arrested the next day on warrants issued in January 2022 for offenses allegedly committed on New Year's Eve. ROA.463-64, 204-227. Darious Harris testified that after New Year's, he saw LPD officers "[e]very day." ROA.689:11. But until April 8, the day after the community meeting, the LPD did not attempt to execute the warrants.

At the hearing, Darious Harris testified that Epps was across the street looking "directly at [him]" as he left the community meeting. ROA.712:14-15; *see also* ROA.684:8-15. The next day, following his brother's arrest, he went to the station and told Henderson he wanted to know the charges against Robert and what would be required to obtain his release. *See* ROA.684:18-25. Dobbins then came out of his office and asked for Darious's name. ROA.684:25-685:8. Darious put up his hands, holding a cell phone, and Dobbins and Henderson tackled him to the ground. ROA.685:13-20. Henderson said, "I was trying to knock your b**** a** out." ROA.685:25. Dobbins said, "[w]e're going to put you on ice." ROA.686:5-6.

These incidents of threats, harassment, violence, and arrests were part of a custom of police retaliation in Lexington. Reeves was targeted twice after criticizing

Epps. Stewart was arrested, tailed, and threatened. Redmond was arrested after going to the station to ask about a relative who had been arrested. And the LPD retaliated against another person who went to the police station to ask about a relative's charges by illegally searching his vehicle. ROA.473.

The record further establishes how Dobbins implemented a policy of retaliation against the Harrises. On the April recording, Dobbins says he had talked to Robert Harris on the phone and told him "this my phone, stop calling my motherf***ing phone. I don't talk to f***ing q****s, I don't talk to f****ts, I ain't got nothing for you, alright, all that s*** you talkin' in the street, we'll go to court bro, we'll go to court. Robert ain't got no driver's license, he gets stopped again he going to jail." ROA.3524 (Ex. C 8:01-8:21).

Dobbins also summed up how police policy works in Lexington on the recording. In his words, "I was raised under a Chief . . . who didn't give a f*** what he said . . . he would tell the Board I don't give a f*** what you say, this is the way my department's gonna to run . . . I kind of inherited that." ROA.3524 (Ex. C 13:51-14:13). Dobbins said, "Now you see I have everybody's respect through town. They may talk that s*** behind my back," but he agreed, as the officer recording him put it, that "they fear your a**." "Oh yes," Dobbins said. "Yesterday was a bad day for them motherf*****s." ROA.3524 (14:25-39).

## II.     Procedural History

In August 2022, Stewart, the Harrises, Reeves, and Redmond filed a complaint against Dobbins, Henderson, Lexington, and the LPD. ROA.9, 38.  After the district court denied their motion for a preliminary injunction, Plaintiffs filed an amended complaint against the same defendants as well as several individual LPD officers, including Epps, Shiers, and Scott. ROA.451. Relevant here, the amended complaint brings claims against those defendants under Section 1983 for violating the Equal Protection Clause of the Fourteenth Amendment and the Fourth Amendment with racially discriminatory roadblocks, for retaliating against the plaintiffs for exercising their First Amendment rights, and for arresting them without probable cause. ROA.482-86.

Dobbins moved for judgment on the pleadings. ROA.747. Henderson, the individual officers, the LPD, and the City joined in Dobbins's motion, ROA. 960, and filed their own motions for judgment on the pleadings or, in the alternative, summary judgment. *See* ROA.970, 1008. Dobbins joined in those motions. ROA.1115.

The district court granted defendants' motions in part. To start, the district court held that only Reeves had standing to bring claims for damages and injunctive relief based on the roadblocks. ROA.1363. Although the district court considered testimony from Stewart and Darious Harris about their roadblock encounters, it

17

concluded that Reeves was the only plaintiff "alleged to have been stopped at a roadblock." ROA.1360, 1363 n.42. The district court allowed Reeve's Fourth Amendment and equal protection claims against the roadblocks to proceed. ROA.1365-67.

The district court next dismissed Stewart's false arrest claim based on the April 9, 2022 arrest, holding that he had "not alleged that Epps knew, or even should have known that Stewart had paid off his fines," and had not alleged "any facts to show Epps could not reasonably have thought there was probable cause." ROA.1319.

With respect to the First Amendment retaliation claims, the district court explained that "a claim for retaliatory arrest . . . cannot succeed where there is probable cause for an arrest." ROA.1327. The district court asserted that "[t]he complaint is littered with dozens of conclusory assertions that defendants harassed plaintiffs for exercising their First Amendment right[s]," "but the only form of 'harassment' they actually describe is . . . arrests and/or detentions." ROA.1327 n.28. And because the district court concluded that there was probable cause for the arrests of Stewart and the Harrises, it dismissed their First Amendment retaliation claims based on those arrests. ROA.1331-32.

The district court also dismissed a First Amendment retaliation claim based on a May 28, 2022 incident where Scott tailed, stopped, and threatened Stewart.

ROA.1332-36. The district court held that there was reasonable suspicion for the stop and that no causal link tied the stop to the April 7 meeting. ROA.1333.

Finally, the district court declined to dismiss Redmond's false arrest claim against Shiers and Dobbins. ROA.1371. But the district court dismissed Redmond's claim against the City because "plaintiffs' allegations are manifestly insufficient to establish the existence of a practice or custom of arresting Lexington citizens without probable cause." ROA.1369.

The district court later severed Redmond's and Reeves's claims. ROA.1576. Redmond's false arrest claim proceeded on the original docket, and the district court ordered the Clerk to open a new action for Reeves's roadblock claims. ROA.1576-77.

Summary judgment was granted for defendants on Reeves's roadblock claims in September 2024. The district court concluded that Reeves's claims were barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), merely because he paid certain fines. *Reeves v. Dobbins*, No. 23-CV-333, Dkt. 298, at 4-10 (S.D. Miss. Sept. 24, 2024). That decision is now on appeal to this Court. *See* No. 24-60557.

The district court denied summary judgment on Redmond's false arrest claims in September 2024. ROA.3323. Redmond and the defendants settled and filed a stipulation of dismissal on January 17, 2025. ROA.3374. The district court entered final judgment that day. ROA.3378. Stewart and the Harrises timely filed this appeal.

# SUMMARY OF ARGUMENT

**I.** The district court erroneously dismissed for lack of standing the roadblock claims brought by the Harrises and Stewart.

**A.** To establish standing to bring claims for damages and injunctive relief based on discriminatory roadblocks, it is not necessary, as the district court held, for a plaintiff to have been stopped at one. A substantial risk of injury provides standing to seek injunctive relief. And a person who has been personally subjected to unequal treatment has suffered a concrete injury for purposes of Article III.

**B.** Malcolm Stewart is a Black resident of Lexington who has encountered discriminatory roadblocks and changed his driving patterns to dodge them. Because he has already been treated unequally and faces a substantial risk of future stops and discriminatory treatment, he has standing to seek damages and injunctive relief.

**C.** Darious Harris was previously stopped at a roadblock, actively avoids the roadblocks, and visits his brother Robert Harris in Lexington. Like Stewart, he therefore has standing to bring claims for damages and injunctive relief.

**D.** For similar reasons as Stewart, Robert Harris's allegations are adequate to establish standing for his roadblock claims.

**II.** The district court erroneously dismissed Stewart's false arrest claims against Epps and Lexington.

**A.** Stewart adequately alleged that Epps arrested him without a warrant or probable cause.

**B.** Lexington has a custom of false arrests based on the five similar incidents identified by the plaintiffs.

**III**. The district erroneously dismissed the plaintiffs' First Amendment retaliation claims.

**A.** Dobbins, Epps, and Henderson threatened the Harrises and used violence against them in retaliation for their First Amendment protected activity. Defendants forfeited qualified immunity on these claims, but regardless, no reasonable officer could believe that those acts were constitutional.

**B.** Stewart adequately alleged retaliation claims against Dobbins, Epps, and Scott. **(1)** Because the April 9 arrest was without probable cause, the dismissal of the retaliatory arrest claim based on that unlawful seizure should be reversed. **(2)** Stewart adequately alleged that Scott threatened and tailed him in retaliation for his First Amendment activity. Scott is not entitled to qualified immunity for that misconduct.

**C.** The First Amendment retaliation claims against the City should proceed. **(1)** Plaintiffs identified at least 18 similar instances of retaliation, Dobbins stated that he had adopted a policy of retaliation, and Lexington was surely aware of that policy. **(2)** Because plaintiffs were arrested under a policy of retaliation, the district court

erred in dismissing the retaliatory arrest claims against Lexington, regardless of probable cause.

## STANDARDS OF REVIEW

Standing is a question of law reviewed "*de novo*." *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015) (citation omitted). Where standing is challenged based on the pleadings, the Court "accept[s] as true all material allegations of the complaint and . . . construe[s] the complaint in favor of the complaining party." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citation omitted). If the district court dismisses based on "undisputed facts," this Court determines "whether the district court's application of the law is correct" and whether the facts "are indeed undisputed." *Moore v. Bryant*, 853 F.3d 245, 248 (5th Cir. 2017) (citation omitted). The resolution of "any disputed facts" is reviewed "for clear error." *Deutsch v. Annis Enters., Inc.*, 882 F.3d 169, 173 (5th Cir. 2018). Dismissal is appropriate "only if 'it appears certain that [the plaintiffs] cannot prove a plausible set of facts that establish" standing. *Umphress v. Hall*, 133 F. 4th 455, 462 (5th Cir. 2025) (per curiam) (quoting *Carroll v. Abide*, 788 F.3d 502, 504 (5th Cir. 2015)).

A judgment on the pleadings under Rule 12(c) is reviewed "*de novo*." *Robinson v. Midland Cnty.*, 80 F. 4th 704, 709 (5th Cir. 2023). To survive a Rule 12(c) motion, "a complaint must contain sufficient factual matter . . . to 'state a claim

to relief that is plausible on its face.'" *Id.* (citation omitted). The Court "accept[s] all well-pled facts as true" and draws "all reasonable inferences . . . in the light most favorable to the plaintiff." *Id.* (citation omitted).

A grant of summary judgment is reviewed "de novo, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205–06 (5th Cir. 2007). Summary judgment is warranted "when the evidence reflects no genuine issues of material fact and the non-movant is entitled to judgment as a matter of law." *Id.* (citation omitted).

## ARGUMENT

### I. The District Court Erred by Dismissing for Lack of Standing the Roadblock Claims.

The district court wrongly decided that Malcolm Stewart, Darious Harris, and Robert Harris lacked standing to bring claims against Lexington's unconstitutional roadblocks just because they had not been stopped at a checkpoint. That holding contradicts well-established law that standing to seek injunctive relief may be based on a substantial risk of injury. These plaintiffs—who live in or visit the tiny town of Lexington—are substantially likely to encounter one of the hundreds of roadblocks LPD sets up to collect fines from Black drivers. Moreover, the district court overlooked that the roadblocks have subjected Stewart and the Harrises to unequal treatment, and that a substantial risk of discriminatory treatment continues under

23

Henderson. But even on the district court's incorrect view of the law, Darious Harris *did* testify that he had been seized at a roadblock and suffered other past injuries, and the district court clearly erred in finding otherwise.

## A.    The District Court Erred in Holding that a Prior Roadblock Stop Was Necessary to Bring a Roadblock Claim.

At the outset, the district court was mistaken that only a plaintiff who had been previously stopped at a roadblock could bring a claim for injunctive relief or damages based on the roadblocks.

To have standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (citation omitted). An injury in fact "must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation and quotation marks omitted). Traceability requires that the defendants' conduct have "significantly contributed to the Plaintiffs' alleged injuries." *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010). And redressability is satisfied if "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Inclusive Cmtys.*, 946 F.3d at 655 (emphases and citation omitted).

For a plaintiff to have standing to seek injunctive relief, he "must show a real and immediate threat of future or continuing injury." *Aransas Project v. Shaw*, 775

F.3d 641, 648 (5th Cir. 2014). In other words, "there must be at least a 'substantial risk' that the injury will occur." *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F. 4th 371, 375 (5th Cir. 2021) (citation omitted).

The district court correctly concluded that Reeves had standing under these principles. *See* ROA.1359-62. As the district court explained, Reeves could bring a damages claim based on his roadblock stop. *See* ROA.1359-61. And the district court also rightly held that Reeves had standing to seek injunctive relief because "Lexington is a small town," and "[a]ssuming that the LPD continues to set up roadblocks with the same frequency alleged in the complaint, it is likely Reeves will encounter another roadblock in the near [future]." ROA.1361-62. In reaching that conclusion, the district court considered Reeves's testimony at the hearing "that he has been able to affirmatively avoid roadblocks by checking texts and social media posts," and that he was stopped at a roadblock after he "failed to check his texts." ROA.1362.

But the district court erroneously held that no other plaintiff had standing because unlike Reeves, none had been stopped at a roadblock. The district court stated that "[t]here is no factual allegation as to any plaintiff other than Reeves relating to a stop at a roadblock." ROA.1363. That was especially so, the district court thought, given Stewart's testimony that he had not been stopped and Darious

Harris's testimony "that he had learned to 'dodge' the roadblocks and had only ridden through one as a passenger." ROA.1363 n.42.

The district court's theory that a past stop is required to bring a claim for injunctive relief or for damages is wrong in two respects.

First, there is no categorical rule that a plaintiff seeking injunctive relief from a racially discriminatory roadblock must have already been stopped at one. To the contrary, a plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief." *Blum v. Yaretsky*, 457 U.S. 991, 1000 (1982) (citation omitted); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) (Article III does "not require a plaintiff to expose himself to liability before bringing suit to challenge" "threatened action" by the government.). "Past wrongs" can of course be "evidence of the likelihood of a future injury." *Crawford*, 1 F. 4th at 375 (citation, quotation marks, and alterations omitted). But "[i]f the injury is certainly impending, that is enough." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (citation omitted).

Second, the district court improperly limited to a Fourth Amendment violation the types of injuries that could support a claim for damages or injunctive relief. As the district court acknowledged, Stewart and the Harrises alleged that "the manner in which [the roadblocks] are set up (in or near predominately black areas and events) and the way they run (stopping black motorists but not white motorists) is

26

racially discriminatory." ROA.1359. And a plaintiff has standing to bring a claim based on the "stigmatic injury" of "racial classification" "if they also allege discriminatory treatment." *Inclusive La. v. St. James Parish*, 134 F. 4th 297, 311 (5th Cir. 2025) (citation omitted).

### B.    Malcolm Stewart Has Standing to Bring Roadblock Claims.

Malcolm Stewart has standing to pursue damages and injunctive relief based on the roadblocks.

As alleged, there is a substantial risk that Stewart will encounter a racially discriminatory roadblock. Stewart is a Black resident of Lexington, a tiny town less than 2.5 miles across. ROA.456, 465. Lexington conducted at least 300 roadblocks between 2021 and 2022, erecting them when the Black high school had events and using them to stop Black drivers. Since Henderson replaced Dobbins in 2022, the policy has continued. ROA.453, 465, 479, 483. What's more, Stewart is a mechanic who drives cars around Lexington, and he has been previously harassed by the LPD while driving. *See* ROA.468-70. And as the district court recognized, a driver's efforts to avoid encountering the roadblocks are likely to fail, as they did for Reeves, given how many racially discriminatory checkpoints are set up by the LPD. *See* ROA.1362.

Given the size of Lexington, the frequency of the roadblocks, the persistence of the policy, and Stewart's race, job, and past experiences as a driver, Stewart has

adequately alleged a substantial risk of injury—especially because Reeves and other Black citizens have already been unlawfully stopped. *See, e.g.*, *Drewniak v. U.S. Customs & Border Prot.*, 554 F. Supp. 3d 348, 365 (D.N.H. 2021) (plaintiffs had standing for injunctive relief where they plausibly alleged frequent travel in the area of the checkpoints); *cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983) (holding that plaintiff lacked standing to seek injunction against police chokeholds where exposure to a future chokehold depended on the plaintiff being arrested again *and* resisting arrest or police officers violating official policy).

The record indeed shows that Stewart has already encountered racially discriminatory roadblocks and will confront them again. Stewart attends most events at the high school—which is precisely when the roadblocks are set up to "collect every last penny" of outstanding fines from the Black community, as Dobbins put it. *See* ROA.83, 597:15-17, 637:20. He once drove through a roadblock, but now he "just pull[s] halfway where they at and turn[s] around" when he encounters them. ROA.619:10-19, 621:6. As explained above, Lexington uses the roadblocks to target Black drivers. *See, e.g.*, ROA.465, 483-84, 597:15-601:10, 634:10-22, 637:18-20. And because Chief Henderson has continued to order roadblocks to be set up around Lexington, including to stop Black churchgoers, Stewart's ability to go about town when the Black community has an event has been obstructed. So instead of using the roads as a White citizen freely could when traveling to and from events at the

high school, Stewart takes a different path to avoid the threat of a racially discriminatory seizure.

This Court recently held that plaintiffs had standing to pursue injunctive relief based on the same type of stigmatic injury. In *Inclusive Louisiana v. St. James Parish*, the plaintiffs claimed that the Parish "steers hazardous industrial development toward the predominantly Black districts (where they reside and worship) while shielding predominantly White districts from industrial development." 134 F. 4th at 311–12. Based on those facts, the Court explained that the plaintiffs had pleaded "a stigmatic injury sufficient for Article III adjudication" because they alleged that the land use decisions were based on racial classifications and had "personally subjected them to unequal treatment." *Id.* A similar injury is alleged here. Lexington steers roadblocks towards events in the Black community and uses those roadblocks to extract fines from Black drivers instead of White drivers. Like the plaintiffs in *Inclusive Louisiana*, Stewart has been personally subjected to that unequal treatment because he lives in Lexington and uses the roads—including those blocked by discriminatory checkpoints—to attend events in his community. And like the *Inclusive Louisiana* plaintiffs, Stewart has standing to seek an injunction.

Stewart's injuries are fairly traceable to the defendants' conduct in implementing the roadblock policy and would be remedied by an injunction against

that policy. The roadblocks are the cause of Stewart's unequal treatment and his substantial risk of a roadblock encounter. *See K.P.*, 627 F.3d at 123. Ending the roadblock policy would at least "lessen" Stewart's unequal treatment and substantial risk of stigmatic injury and Fourth Amendment violations, which is all that standing requires. *Inclusive Cmtys.*, 946 F.3d at 655.

It makes no difference that Stewart has not yet been seized at one of Lexington's roadblocks. Stewart does not need to intentionally subject himself to an unlawful stop. He has *already* suffered a stigmatic injury. *Cf. Frame v. City of Arlington*, 657 F.3d 215, 236 & n.104 (5th Cir. 2011) (en banc) ("[A] disabled individual need not engage in futile gestures before seeking an injunction; the individual must show only that an inaccessible sidewalk actually affects his activities in some concrete way."); *Teamsters v. United States*, 431 U.S. 324, 366 (1977) (explaining that, in Title VII context, the "futile gesture" of applying for a discriminatory job posting is not required for a person to be "a victim of discrimination"). He is still deprived of the same checkpoint-free access to the roads during events at the Black high school as drivers have when attending events at the White high school. And he is subject to LPD's racially discriminatory use of those roadblocks to stop Black drivers—not White ones.

### C.    Darious Harris Has Standing to Bring Roadblock Claims.

Like Stewart, Darious Harris also has standing to bring claims for damages and injunctive relief based on the roadblocks.

At the outset, the district court clearly erred in concluding that Harris had not been stopped at a roadblock. *See* ROA.1363 & n.42. Harris testified that he was a passenger in his cousin's vehicle when his cousin was stopped for half an hour at a roadblock. ROA.696:3-18. It is blackletter law that "a stop results in the seizure of the passenger and driver alike." *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003) (emphasis and citation omitted). So "a passenger of a stopped automobile" such as Harris has "standing" in the Fourth Amendment context "to challenge the seizure of his person as unconstitutional." *Id.* Harris also has standing based on his personal experience of unequal treatment during that stop. *See Inclusive La.*, 134 F. 4th at 311–12. Harris accordingly has standing to bring a damages claim.

The record shows that Harris suffered other past injuries in addition to the unlawful seizure. He testified that if the LPD sets up "a roadblock, I probably won't even go to Lexington, period." ROA.694:3. After being arrested by LPD in April 2022, Harris went to Lexington twice for his brother's cookouts, but he testified that it was "dangerous" because "every time you go that way, it's always a roadblock." ROA.692:12-13. As a result, he lost 15 jobs in Lexington. ROA.692:16-693:3. And he stopped grocery shopping in Lexington, driving dozens of miles further to find a

store. ROA.693:12-17. These economic harms give Harris standing to sue for damages.

Harris is also suffering an ongoing injury from the roadblocks policy sufficient to support injunctive relief. At the time this lawsuit started, Harris lived in a neighboring town.[2] As alleged in the amended complaint, "[f]or years, he traveled to Lexington several times each week to visit his brother." ROA.456. But since his arrest in April 2022, Harris "has tried to avoid entering the town out of fear that he will again be targeted, assaulted, and arrested." ROA.464. He testified that it was "dangerous" to visit Lexington because of its frequent roadblocks. ROA.692:11-13. Any time Harris does visit, he faces a substantial risk of a roadblock encounter, just like Stewart. And like Stewart, he faces a continuing injury from being unable to freely travel to and through Lexington as a White citizen could without encountering a discriminatory roadblock.

Harris's injuries are also fairly traceable to the defendants' conduct and would be remedied by an injunction. As described above, the roadblocks policy has "significantly contributed to" the violation of Harris's rights under the Fourth Amendment and the Equal Protection Clause, as well as his economic harms. *K.P.*,

---

[2] Harris moved to Milwaukee in 2023. *See* Mot. to Supplement the Record. Because Harris has since visited his brother in Lexington for Mother's Day this year and plans to visit again on future holidays, his claims for injunctive relief are still "live." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation omitted).

627 F.3d at 123. And ending the roadblock policy would at least "lessen" Harris's inability to visit Lexington without facing unequal treatment and unlawful seizures. *Inclusive Cmtys.*, 946 F.3d at 655.

### D.    Robert Harris Has Standing to Bring Roadblock Claims.

Finally, Robert Harris also has standing to bring roadblock claims. The amended complaint alleges that, like Stewart, Harris is a Black resident of Lexington who works as a mechanic. ROA.455. He drives and "service[es] the surrounding communities." ROA.455. So, given how many roadblocks aimed at Black drivers are set up in such a small town, Harris also faces a substantial risk of roadblock encounters and unequal treatment from the policy that would be remedied by an injunction.

* * *

For those reasons, Stewart and the Harrises "can[] prove" far more than just "a plausible set of facts that establish" standing. *Umphress*, 133 F. 4th at 462 (citation omitted). The district court's decision dismissing the roadblock claims should be reversed.

## II.    The District Court Erred by Dismissing Malcolm Stewart's False Arrest Claims Against Epps and the City.

### A.    Stewart's False Arrest Claim Against Epps Should Proceed.

Two days after the community meeting where Stewart spoke out against the LPD, Epps arrested him, supposedly on a warrant for outstanding fines. An arrest is

permissible under the Fourth Amendment only if "supported by a properly issued arrest warrant or probable cause." *Hall v. Trochessett*, 105 F. 4th 335, 341 (5th Cir. 2024) (citation omitted). Stewart alleged that no warrant existed for his arrest and that he had already received notice from the municipal clerk that he had paid off his fines by repairing LPD vehicles. But the district court wrongly held that Stewart failed to plead that Epps lacked probable cause to arrest him and that his allegations were insufficient to overcome qualified immunity. ROA.1319.

Stewart alleged that an arrest warrant based on his outstanding fines either did not exist or was facially invalid. Although "Epps claimed that he was arresting Mr. Stewart for outstanding fines" and "claimed there was a warrant for his arrest," Stewart alleged that Epps never showed him the warrant "and that the judge said he did not sign" it. ROA.468. From those allegations, it is reasonable to infer that no warrant was ever properly issued by a magistrate to support Stewart's arrest. *Cf. United States v. Leon*, 468 U.S. 897, 913–14 (1984) (describing warrant requirement). And despite having the chance to put the arrest warrant into the record, Epps did not produce any such warrant among Stewart's arrest documents. *See* ROA.233-54.

Stewart also pleaded there was no probable cause based on outstanding fines to seek a warrant or arrest him. Probable cause exists "when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are

sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (citation omitted). This "test is objective, not subjective." *Sam v. Richard*, 887 F.3d 710, 715 (5th Cir. 2018). Stewart simply did not have any outstanding fines for which he could have been charged. Drawing all reasonable inferences in Stewart's favor, that fact would have been known to any LPD officer, including Epps, given the notice Stewart received from the municipal clerk in July 2021 that the fines had been paid, the deal Stewart struck with the former Chief of Police to pay off the fines, and the way Stewart worked off his fines—repairing LPD cars. ROA.468. A reasonable person could not have concluded, based on these circumstances, that Stewart had outstanding fines. Indeed, nine months passed in the tiny town of Lexington before Stewart was first arrested for these outstanding fines in April 2022—right after Stewart challenged the LPD at the community meeting.

The district court even recognized that Stewart's testimony was consistent with his allegations that he received notice that he did not have any outstanding fines. *See* ROA.1318-19. Stewart testified that his payment was documented in the City's computer system and thus readily available to the LPD and Epps. ROA.610:19-25.

But the district court *still* failed to take Stewart's allegations as true and to draw all reasonable inferences in his favor. The district court instead decided that Stewart had "not alleged that Epps knew, or even should have known that Stewart

had paid off his fines," and had not alleged "any facts to show that Epps could not reasonably have thought there was probable cause to arrest Stewart." ROA.1319. The district court was wrong to focus on Epps's "subjective belief[s]" about the fines rather than "the belief of a reasonable person in [Epps's] position." *Petersen v. Johnson*, 57 F. 4th 225, 233 (5th Cir. 2023) (emphases omitted). Regardless, the district court's holding cannot be reconciled with Stewart's allegations that he had an arrangement with the former LPD Chief, paid the fines by working for the LPD, and received official notice that the fines were paid, and that Epps misrepresented the existence of a warrant. These "historical facts, viewed from the standpoint of an objectively reasonable police officer," did not "demonstrate a probability or substantial chance of criminal activity." *Reitz v. Woods*, 85 F. 4th 780, 791 (5th Cir. 2023) (citation and quotation marks omitted). Only by impermissibly drawing inferences *against* Stewart could the district court have concluded otherwise. *See, e.g.*, *Rodriguez v. Rutter*, 310 F. App'x 623, 627–28 (5th Cir. 2009) (per curiam).

The only ground to dismiss the April 9 false arrest claim raised by defendants in their motions for judgment on the pleadings or summary judgment was that Epps had probable cause to arrest Stewart for outstanding fines. *See* ROA.747-75, 980-81, 1018-19, 1107, 1256, 1275. They accordingly forfeited any other basis for probable cause that would require dismissal of this claim. *See Rollins v. Home Depot USA*, 8 F. 4th 393, 397 (5th Cir. 2021). But to the extent the district court suggested

that Epps had probable cause to arrest Stewart for driving with expired tags, that was mistaken, too. *See* ROA.1318 & n.13. Stewart testified that the tags on the vehicle were not expired and that he saw that the license plate had been renewed. ROA.589:7-25, 608:3-609:11.

Finally, Epps is not entitled to qualified immunity. In the false arrest context, qualified immunity does not apply if an officer "lack[]s arguable (that is, reasonable but mistaken) probable cause." *Club Retro, L.LC. v. Hilton*, 568 F.3d 181, 207 (5th Cir. 2009). Probable cause was not even arguable here. Stewart pleaded that the fines were paid through a deal with the LPD to service its vehicles, and that Epps misrepresented the existence of a warrant to support the arrest. It would not have been "reasonable" for an officer to conclude that there was probable cause to arrest Stewart for outstanding fines in these circumstances.

**B.      Stewart's False Arrest Claim Against the City Should Proceed.**

The district court concluded, without further analysis, that the "plaintiffs' allegations are manifestly insufficient to establish the existence of a practice or custom of arresting Lexington citizens without probable cause." ROA.1369. But plaintiffs have identified enough similar past incidents from which a municipal policy could be inferred.

A municipality is liable under Section 1983 for the deprivation of a federal right if the "moving force" for the deprivation was "an official policy (or custom)"

of which "actual or constructive knowledge" is "attributable to the governing body of the municipality." *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010) (citations omitted). At the pleading stage, the existence of such a custom can be established by alleging similar specific incidents that are "sufficiently numerous" and have "occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017) (citation omitted).

Plaintiffs identified at least six incidents of false arrests. In addition to Stewart's April 2022 arrest, Redmond claimed he was falsely arrested for disorderly conduct while he was "merely standing outside the police station."   ROA.1314. Stewart testified that he was pulled over in August 2022 with his headlights off for supposedly having a headlight out, and was then arrested on a warrant that the officer admitted did not exist. ROA.591:15-593:13, 617:7-618:24. And the amended complaint provides three more examples aside from the plaintiffs' arrests. Tyqwon Walden was allegedly arrested on a traffic violation while he was shopping in a convenience store, and the LPD even claimed he committed traffic violations at times when he did not have access to a car. ROA.472. Darnell Malone was allegedly arrested in a gas station based on warrants for traffic violations that were never shown to him. ROA.472. And the LPD allegedly broke down an unnamed woman's

door without a warrant, maced her, and arrested her without probable cause. ROA.471.

These incidents are sufficiently similar, numerous, and specific to allege a custom in Lexington of false arrests. Like the April 2022 arrest of Stewart, they all involve the LPD either claiming to have an arrest warrant that was never produced or arresting a person with no probable cause. *Cf. Bond v. Nueces Cnty.*, 2022 WL 4595000, at *6 (5th Cir. Sept. 30, 2022) (deciding, at pleading stage, that "the alleged incidents are adequately similar" where injuries were caused by the same general type of misconduct). And Lexington has fewer than 1,800 residents. ROA.451. In such a small town, these incidents, four of which occurred within just five months of each other, support a practice "so common and well-settled as to constitute a custom that fairly represents municipal policy." *Peterson v. City of Ft. Worth*, 588 F.3d 838, 850 (5th Cir. 2009) (citation omitted). Put differently, false arrests were "the expected, accepted practice of" the LPD. *Davidson*, 848 F.3d at 396.

## III. The District Court Erred by Dismissing the Plaintiffs' First Amendment Retaliation Claims.

### A. The District Court Erred by Dismissing the Harrises' Retaliation Claims Against Dobbins, Epps, and Henderson.

As alleged in the amended complaint, "the main thrust" of the Harrises' First Amendment retaliation claims is "retaliatory force, harassment, threat[s], and intimidation." ROA.1151 (capitalization altered); *see also* ROA.1184. The district

court disregarded those non-arrest claims, concluding that "the only form of 'harassment' [the Harrises] actually describe is [their] arrests and/or detentions." ROA.1327 n.28. But the amended complaint adequately alleged First Amendment retaliation based on misconduct other than false arrests, and the record includes ample evidence supporting those allegations.

To prove a First Amendment retaliation claim, a plaintiff is required to show that he was (1) "engaged in constitutionally protected activity," "(2) the defendants' actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the [plaintiff's] exercise of constitutionally protected conduct." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). All three elements are met here.

First, the Harrises engaged in constitutionally protected activity by criticizing and challenging the LPD's conduct. The First Amendment protects "verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987). After the LPD told them to stop shooting fireworks—even though other families on the same block were allowed to continue—the Harrises, "exhausted by LPD's constant harassment, told the officers, including . . . Dobbins, to vacate their premises. The brothers . . . verbally resisted the officers' threats." ROA.459. And Robert Harris "held up his hand toward the officers in a plea for them to leave their

40

property." ROA.459. These challenges to the LPD, as well as others described in the amended complaint and the record, were protected First Amendment activity. *See, e.g.*, ROA.3524 (footage of Robert Harris shouting, shortly before Darious is tased, "every time you come around I lose my life and my freedom. Stay away from me. I don't f*** with you. . . . Stop f***ing with me" (Ex. E 0:53-1:02)), 712:9-16 (testimony that Epps saw Darious leaving the community meeting).

Second, the LPD used violence against the Harrises "that would chill a person of ordinary firmness from continuing to" criticize and challenge the police. *Keenan*, 290 F.3d at 258. Just after Robert Harris pled with the officers to leave his property on New Year's Eve, Epps tased Darious Harris and shocked him with electricity as Darious thrashed and screamed. *See* ROA.459, 3524 (Ex. E 1:20-40). The taser probes were left in Darious's body for an hour, and Dobbins eventually instructed the EMTs to snatch them out without the proper tools. ROA.463, 680:1-12. Darious Harris also testified that when he went to ask about Robert's arrest in April 2022, Henderson tackled him to the ground and said, "I was trying to knock your b**** a** out." ROA.684:16-685:25. Dobbins said, "[w]e're going to put you on ice." ROA.686:5-6. Injuries such as these "suffered as a result of the use of force during [an] arrest" "would chill a person of ordinary firmness from continuing to engage" in First Amendment protected activity. *Bailey v. Ramos*, 125 F. 4th 667, 685 (5th Cir. 2025) (citation and quotation marks omitted). Being tased, shocked with

electricity for at least ten seconds, dragged to a police vehicle, and wounded by the improper extraction of the probes would be enough to chill a person from speaking out against the police again. So would being tackled with force intended to render the victim unconscious. *See, e.g.*, *Irizarry v. Yehia*, 38 F. 4th 1282, 1292–93 (10th Cir. 2022) (shining a flashlight into a person's camera, driving police cruiser at the person, and gunning car at that person's colleague "would be more than sufficient to chill a person").

The LPD's threats against the Harrises would also chill the exercise of any reasonable person's First Amendment rights. When Robert Harris went to the station after Darious's arrest, Dobbins told him to "shut up" and "leave," twisted his arm behind his back, took him back to his office, and threatened him that if they kept "bumping heads" there would be a "killing." ROA.462. Robert Harris "was scared for his life." ROA.462. Darious Harris testified that he heard Dobbins say, "Robert, y'all need to stop this before somebody get killed. This need to be the end of this. Y'all need to leave this alone." ROA.681:6-9. And another officer "said if it was him, he wouldn't have pulled his taser out. He would have pulled his gun out." ROA.681:22-23. A "threat from an officer to arrest someone in retaliation for protected speech could chill a person of ordinary firmness from engaging in protected activity." *Hicks v. Dowies*, 2022 WL 827804, at *2 (W.D. La. Mar. 18, 2022); *see also Brown v. Jones Cnty. Junior Coll.*, 463 F. Supp. 3d 742, 760–61

(S.D. Miss. 2020) (collecting cases). A death threat is more than enough. And as explained above, the LPD's retaliatory conduct towards Darious was so extreme that he did not visit the town—let alone criticize the police there.

Third, the actions of Dobbins, Shiers, and Henderson "were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." *Keenan*, 290 F.3d at 258. Dobbins repeatedly said so. He told Robert Harris that if they kept "bumping heads" there would be a "killing." ROA.462. Darious Harris testified that Dobbins told him, if he "hadn't been running [his] mouth . . . [he] wouldn't have got tased for talking." ROA.679:13-14. He heard Dobbins say, "Robert, y'all need to stop this before somebody get killed. This need to be the end of this. Y'all need to leave this alone," ROA.681:7-9, and "I don't want to hear nothing else about this." ROA.682:9. And Dobbins was caught on tape saying, "all that s*** you talkin' in the street, we'll go to court bro, we'll go to court. Robert ain't got no driver's license, he gets stopped again he going to jail." ROA.3524 (Ex. C 8:01-8:21).

Moreover, the tasing of Darious Harris, the threats Dobbins made in the police station, and the violence used against Darious in April 2022 occurred within seconds or hours of the Harrises exercising their First Amendment rights. For example, Darious was tackled the day after the community meeting and just moments after asking about Robert's arrest. That "very close" temporal proximity would be

"sufficient evidence of causality" alone. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citation and quotation marks omitted) (adverse employment action context).

Based on all those allegations and evidence, "one could reasonably infer that" Dobbins, Epps, and Henderson were "substantially motivated by" the Harrises' criticism and challenges to their authority. *Rincon v. City of Laredo*, 2025 WL 603883, at *5 (5th Cir. Feb. 25, 2025) (per curiam).

Dobbins is also liable for the retaliatory conduct of Henderson and Epps. As he admitted on the April 2022 recording, as his statements to the Harrises on New Year's Eve reflect, and as described further below, Dobbins "implement[ed]" an "unconstitutional polic[y]" of retaliation. *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 420 (5th Cir. 2017). As Dobbins said, Epps tased Darious Harris for talking. As Dobbins said, confrontations between the Harrises and the LPD—including verbal standoffs such as the one on New Year's—would lead to Robert or Darious getting killed. And as Dobbins said, because Robert Harris was talking in the streets, he would be arrested. These statements at the very least show that Dobbins acted with "deliberate indifference" to Henderson's and Shiers's unconstitutional acts, if he did not expressly order them to retaliate as the evidence suggests. *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011).

Finally, the defendants forfeited qualified immunity as to the non-arrest retaliation claims by failing to make any specific argument before the district court about why that defense applied to those claims. *See Rollins*, 8 F. 4th at 397; ROA.765-66, 974-77, 1012-15, 995-96 (ignoring non-arrest claims entirely with respect to qualified immunity), 1033-34 (same), 1104-06, 1111-13, 1253 & n.2, 1272 & n.2, 1263 (arguing, at most, that "Plaintiffs cite caselaw only for broad propositions of law, and then claim that they do not have to point to a factually analogous case. . . . [A]nd they cite no cases where there was probable cause for arrest like is present here."), 1282 (same). But regardless, there is a clearly established right to criticize and challenge the police. *See, e.g.*, *Hill*, 482 U.S. at 462– 63. The use of "concrete intimidating tactics" by the police in retaliation for that protected conduct clearly violates the First Amendment. *Keenan*, 290 F.3d at 259; *id.* at 261 & n.7 ("[G]overnment retaliation against a private citizen for exercise of First Amendment rights cannot be objectively reasonable," and so "there is no immunity shield" for "official intimidation."). Given that longstanding authority, "no reasonable . . . officer could have concluded that . . . it was constitutionally permissible" to tase or threaten to kill someone for criticizing the police. *Taylor v. Riojas*, 592 U.S. 7, 8–9 (2020) (per curiam); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

**B.  The District Court Erred by Dismissing Malcolm Stewart's Retaliation Claims Against Dobbins, Epps, and Scott.**

Next, the district court made two fundamental errors in dismissing Stewart's First Amendment retaliation claims. First, the district dismissed Stewart's retaliation claim against Epps because it erroneously concluded that there was probable cause for the April 2022 arrest. ROA.1332. Second, the district court construed Stewart's retaliation claims against Scott far too narrowly as claims of retaliatory detention and compounded that error by resolving questions of causation in Scott's favor. ROA.1332-36. This Court should reverse the dismissal of these claims. And because Dobbins is liable for implementing an unconstitutional policy of retaliation, or at the least was deliberately indifferent to it, the dismissal of the retaliation claim against Dobbins based on these incidents should be reversed as well. *See* Section III.A.

**1.  Stewart Adequately Alleged His Retaliatory Arrest Claim Against Epps.**

Stewart's retaliatory arrest claim against Epps is straightforward. He alleges that two days after he participated in a community meeting concerning LPD's abusive and discriminatory practices, Epps arrested him without probable cause in retaliation for his protected First Amendment activity. *See* ROA.468.

The district court dismissed that claim in light of its earlier finding that Stewart failed to adequately allege the absence of probable cause for his arrest. ROA.1332. "[A]s a general rule, a plaintiff bringing a retaliatory-arrest claim 'must

plead and prove the absence of probable cause for the arrest.'" *Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024) (per curiam) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019)). But, as explained above, Stewart did just that. *See* Section II.A.

Stewart also adequately pleaded "that the retaliation was a substantial or motivating factor behind the arrest." *Nieves*, 587 U.S. at 404 (citation omitted). Epps arrested Stewart a mere two days after Stewart spoke at the April 7 meeting. ROA.468. Even though the arrest was for fines that Stewart had incurred no later than 2020—and had worked off by July 2021—Stewart was not arrested until after the April 2022 community meeting. *See* ROA.468. Robert Harris and Darious Harris were also arrested shortly after attending the meeting, also on charges that had been outstanding for months. And Epps knew Stewart participated in the meeting. Lexington is a small town. As Stewart alleged, "[k]nown friends of LPD officers attended" the meeting. ROA.463. In light of all this, it is common sense that news of a community meeting criticizing the police would be known to the LPD, including Epps. Moreover, Darious Harris testified at the TRO hearing that he saw Epps when he left the community meeting, parked across the street so that he could observe participants as they exited the building, "look[ing] directly at" Harris. ROA.712:5-16; *see also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("It is beyond debate that freedom to engage in association for the advancement of beliefs

and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.").

Finally, Epps is not entitled to qualified immunity. By April 2022, it was clearly established that a retaliatory arrest without probable cause violates the First Amendment. *See, e.g.*, *Nieves*, 587 U.S. at 404. The district court's decision dismissing this claim against Epps should therefore be reversed.

### 2. Stewart Adequately Alleged Retaliation Claims Against Scott.

Stewart also brought First Amendment retaliation claims against Scott based on misconduct other than unlawful seizures. On May 28, 2022—around seven weeks after the community meeting and Stewart's arrest on the supposed warrant—Scott followed Stewart out of a gas station and threatened him by claiming the authority "to do whatever [he] wanted to." ROA.469. And on a separate occasion, Scott allegedly tailed Stewart, followed him into a gas station, and only left him alone after Stewart mentioned his lawyer. ROA.469. The district court ignored the latter claim and improperly misconstrued the former to be based on the traffic stop alone. The district court then dismissed that claim, concluding that there was reasonable suspicion for the stop and that Stewart failed to allege a causal link between his First Amendment protected activity and the stop. ROA.1332-1336.

Stewart adequately alleged that Scott retaliated against him by tailing and threatening him. The district court never even considered whether this conduct could

give rise to a retaliation claim. But there is no dispute that following a target on two occasions and threatening that the officer could "do whatever [he] wanted to" him "would chill a person of ordinary firmness from continuing to" speak out against police misconduct. *Keenan*, 290 F.3d at 258; *see also United States v. Smith*, 110 F. 4th 817, 837 (5th Cir. 2024) (citation omitted) ("Awareness that the government may be watching chills associational and expressive freedoms.").

Stewart also adequately alleged a causal link between his protected activity and Scott's conduct. The May 28 incident occurred less than two months after the community meeting and the April 9 arrest. This Court has "accepted" similar "gaps of less than two months" as establishing causation at the prima facie stage in the context of adverse employment actions. *Porter v. Houma Terrebone Housing Auth. Bd. of Comm'rs*, 810 F.3d 940, 949 & n.39 (5th Cir. 2015) (collecting cases). There is no reason to view the allegations here differently, especially because Stewart alleged *multiple* incidents of retaliation within that two-month gap stemming from the community meeting. And as explained above, it is reasonable to infer that Scott knew about Stewart's protected activity. Moreover, as Stewart testified, April 7 was not the only day Stewart engaged in protected First Amendment activity. He filed several formal and informal complaints about the LPD, including with the Mayor and the Justice Court, and complained about his April 9th arrest to Alderman Simmons and Alderman Pitchford. ROA.594:12-597:6.

49

Scott is not entitled to qualified immunity for this conduct. As with the Harrises, the defendants forfeited qualified immunity as to Stewart's non-arrest retaliation claims. And for the reasons stated above, see Section III.A, the use of "concrete intimidating tactics" by the police in retaliation for First Amendment protected activity clearly violates the Constitution. *Keenan*, 290 F.3d at 259–60. No reasonable officer could conclude that it was lawful to retaliate against a person who spoke out against the police by tailing and then threatening him.

### C. The District Court Erred by Dismissing the First Amendment Retaliation Claims Against the City.

Because the district court incorrectly held that the plaintiffs' First Amendment retaliation claims failed, it did not reach whether they had adequately pleaded or put forward sufficient evidence for a reasonable jury to find municipal liability. *See* ROA.1368-70. But the allegations and facts before the district court easily give rise to a reasonable inference of a custom of retaliation. And even if probable cause did exist for the arrests of Stewart and the Harrises, Lexington is liable for those arrests because they were carried out under a retaliatory policy.

### 1. Lexington is Liable for the Retaliation Against Stewart and the Harrises.

Stewart and the Harrises have set forth a pattern of retaliatory police conduct so persistent and widespread that it represents the policy of Lexington. *See Peterson*, 588 F.3d at 850.

The incidents alleged in the amended complaint or described in the record include (1) Epps arresting Stewart two days after the community meeting; (2) Scott following Stewart out of a gas station and threatening him less than two months later; (3) Scott tailing Stewart into a gas station and refusing to leave until Stewart invoked his attorney; (4) Shiers arresting Stewart in June 2022, the day after civil rights attorneys met with the City Attorney; (5) Stewart's arrest in August 2022 on a warrant that didn't exist, (6) Henderson threatening to kill Stewart in 2019 if Stewart refused to move his car off a private lot, and Henderson then opening the car door with a gun in hand after Stewart called the Sheriff, ROA.602:21-603:22, 621:22-622:9; (7) Redmond's June 2022 arrest without probable cause after asking about why his sister's bail had increased; (8) Shiers's threat to tase Redmond during that encounter; (9) the LPD's decision to tow Redmond's car without notice from a private lot during that incident; (10) Epps tasing Darious Harris for "talking" on New Year's Eve, as Dobbins described it; (11) Harris's arrest after being tased for "talking"; (12) Dobbins's death threat to Robert Harris that evening; (13) Robert Harris's arrest after the community meeting, (14) Darious Harris's arrest after the community meeting, (15) Henderson tackling Darious Harris after he went to the station in April 2022 to ask about charges against Robert Harris, (16) Epps arresting Reeves in March 2022 after he criticized Epps on social media, (17) Epps ticketing Reeves after he criticized Epps on social media, and (18) the LPD's unlawful search

of the vehicle of a person who went to the station to ask about a relative's charges, ROA.473.

The number and similarity of these incidents—most occurring between December 2021 and July 2022 and under Dobbins—are striking and could not have been unknown to Lexington. Many involve retaliation against different individuals following one community meeting where citizens shared grievances about the LPD. In such a small town, it would be reasonable to infer that the Board and Mayor were well aware that retaliation was "the expected, accepted practice" of the LPD. *Davidson*, 848 F.3d at 396 (5th Cir. 2017); *see, e.g.*, *Bond*, 2022 WL 4595000, at *8 & n.4 (5th Cir. Sept. 30, 2022) (explaining how size of municipality matters in pattern analysis). And complaints about the LPD were "the subject of prolonged public discussion." *Pineda v. City of Houston*, 291 F.3d 325, 330 (5th Cir. 2002) (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984)); *see, e.g.*, ROA.458 (discussing 200 complaints about the LPD since Dobbins became Chief); *cf.* ROA.574:14-575:7 (describing how the County Sheriff brought complaints about Dobbins multiple times to the City Board and once to the Mayor); ROA.594:12-597:6 (Stewart's complaints).

If Lexington's custom of retaliation were not clear enough, Dobbins explained on the April 2022 recording that he had implemented a policy about which Lexington was aware. He explained that he intended to arrest Robert Harris for

"talkin' in the street." That plan was consistent with previous statements Dobbins had made that Robert Harris would be "killed" if he confronted the police again and that Darious Harris had been tased by Epps for "talking." Dobbins described how he approached all this with the Board. In his own words, "I was raised under a Chief . . . who didn't give a f*** what he said . . . he would tell the Board I don't give a f*** what you say, this is the way my department's gonna to run . . . I kind of inherited that." ROA.3524 (Ex. C 13:51-14:13). And as explained above, this policy—orchestrated by Dobbins and accepted by the governing body of Lexington—was the moving force behind the LPD's retaliation against Stewart and the Harrises for exercising their First Amendment rights.

### 2. Lexington is Also Liable for the Retaliatory Arrests of Stewart and the Harrises.

Finally, the district court erred by failing to consider whether Stewart and the Harrises stated a claim based on their retaliatory arrests against Lexington under *Lozman v. Riviera Beach*, 585 U.S. 87 (2018). *See* ROA.1153.

In *Lozman*, the Supreme Court held that "a First Amendment retaliatory arrest claim against a municipality may survive despite the presence of probable cause under certain circumstances." *Mayfield v. Butler Snow, L.L.P.*, 75 F. 4th 494, 501 (5th Cir. 2023). After moving to Riviera Beach, Lozman started criticizing the city. 585 U.S. at 91. At a city council meeting, a member of the council, Elizabeth Wade, suggested that the City "intimidate" Lozman, and other councilmembers agreed. *Id.*

53

About five months later, Wade ordered Lozman to stop speaking at a public meeting. *Id.* at 92. Lozman refused, Wade told a police officer to "carry him out," and the officer then arrested Lozman for disorderly conduct. *Id.* Lozman conceded that the officer had probable cause to arrest him but argued that the City "formed an official policy to retaliate against him and ordered his arrest." *Id.* at 95. The Court concluded that probable cause for an arrest did not bar such a claim. *Id.* at 101; *see also Villareal v. City of Laredo*, 134 F. 4th 273, 279 (5th Cir. 2025) (Oldham, J., concurring) ("The Court in *Lozman* held that individuals did not need to prove the absence of probable cause when suing a municipality for retaliatory arrest.").

Even assuming the police did have probable cause to arrest Stewart in April and June 2022 and the Harrises on New Year's Eve 2021 and in April 2022, those arrests were pursuant to the official policy of retaliation described above. *See* Section III.C.1. In fact, around the time Stewart and the Harrises were arrested just after the community meeting in April 2022, Dobbins said he planned to arrest Robert Harris for "talkin' in the street" and explained that *he* told the Board how the LPD would operate—not the other way around. Moreover, although the warrants for the Harrises' arrest had issued in January 2022, and although Darious testified that he saw the LPD every day, the Harrises were not arrested on those warrants until after Epps saw Darious leaving the community meeting. The "extensive evidence" that Lexington had a custom of the LPD using "city resources to intimidate" the plaintiffs

because of their First Amendment activity is more than sufficient to state a *Lozman* claim. *Mayfield*, 75 F. 4th at 501.

## CONCLUSION

For those reasons, Malcolm Stewart, Darious Harris, and Robert Harris respectfully request that the judgment of the district court be reversed and the case remanded for further proceedings.

Dated: May 28, 2025                    Respectfully submitted,

                                       */s/  Jason Bell*
                                           Jason Bell

                                       NATIONAL POLICE ACCOUNTABILITY
                                       PROJECT

                                       Lauren Bonds
                                       Keisha James
                                       Eliana Machefsky
                                       1403 Southwest Boulevard
                                       Kansas City, Kansas 66103
                                       (504) 220-0401
                                       legal.npap@nlg.org
                                       keisha.npap@nlg.org
                                       eliana.npap@nlg.org

                                       JULIAN

                                       Jill Collen Jefferson
                                       440 N. Barranca Avenue, Suite 3717
                                       Covina, California 91723
                                       (601) 202-1173
                                       jillcollen@julianfreedom.org

                                       SUSMAN GODFREY L.L.P.

                                       Jillian Hewitt
                                       Jason Bell
                                       One Manhattan West
                                       New York, New York 10001
                                       (212) 336-8330
                                       jhewitt@susmangodfrey.com

jbell@susmangodfrey.com

*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeal for the Fifth Circuit on May 28, 2025, by using the appellate CM/ECF system and that service was accomplished on all counsel of record by the appellate CM/ECF system.

Dated: May 28, 2025

*/s/ Jason Bell*
Jason Bell

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(g)(1) and 5th Cir. R. 32.3, I certify that Plaintiffs-Appellants' Principal Brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2, this document contains 13,000 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1, and the type-style requirements of Fed. R. App. P. 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO (Version 2503) in Times New Roman 14-point font.

Dated:  May 28, 2025                                    */s/ Jason Bell*
                                                              Jason Bell